IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CV-00425-D

PAUL L. LONG,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )
                                       )        **MEMORANDUM &**
                                       )        **RECOMMENDATION**
MICHAEL J. ASTRUE,                     )
Commissioner of Social                 )
Security,                              )
                                       )
        Defendant.                     )
_____              )

        This matter is before the Court upon Plaintiff's and Defendant's cross motions for

judgment on the pleadings.  [DE-37, DE-39].  The parties submitted memoranda in support of

their motions [DE-38, DE-40], and the time to file any further responses or replies has expired.

Accordingly, the matter is now ripe for adjudication.  Pursuant to 28 U.S.C. § 636(b)(1), this

matter has been referred to the undersigned for the entry of a memorandum and recommendation.

For the following reasons, it is RECOMMENDED that Plaintiff's motion for judgment on the

pleadings [DE-37] be DENIED, that Defendant's motion for judgment on the pleadings [DE-39]

be GRANTED, and that the final decision by Defendant be AFFIRMED.

**Statement of the Case**

        Plaintiff filed an application for a period of disability and disability insurance benefits

("DIB") on November 27, 2007, alleging a disability onset date of May 15, 2003.  [DE-13, p.16].

His application was denied initially and on reconsideration.  [*Id.*].  Plaintiff brought his claim

before an administrative law judge ("ALJ"), who held a hearing on September 18, 2009. [DE-14, DE-13, p.16]. A vocational expert ("VE") testified at the hearing. On November 6, 2009, the ALJ issued a decision denying Plaintiff's application for DIB. [DE-13, pp.13-24]. The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision. [DE-13, pp.1-5]. The ALJ's decision thus became the final decision of the Commissioner. Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g). [DE-4].

**<u>Standard of Review</u>**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]

"Under the Social Security Act, [the court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." <u>Craig</u>, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by

substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

The Social Security Administration has promulgated the following regulations establishing a sequential evaluation process to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

<u>Mastro v. Apfel</u>, 270 F.3d 171, 177 (4th Cir. 2001).

## **ALJ's Findings**

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. [DE-13, p.18]. At step two, the ALJ found that Plaintiff suffers from the following severe impairments: (1) diabetes mellitus; (2) hypertension; (3) coronary artery disease; (4) degenerative disc disease; (5) degenerative joint disease of the right knee; (6) obesity; (7) sleep apnea; and (8) melanoma of the left arm. [DE-13, p.18]. However, the ALJ determined that these impairments or combination of impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. [DE-13, p.22]. After evaluating the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to sit six hours; stand and walk six hours during an eight-hour workday with a sit/stand option; lift and carry twenty

pounds occasionally and ten pounds frequently; and push and pull twenty pounds occasionally and ten pounds frequently. [DE-13, p.22]. The ALJ determined Plaintiff had no capacity to balance or climb ladders and could not work around dangerous machinery or at heights. The ALJ then proceeded with step four of his analysis and determined that Plaintiff is capable of performing his past relevant work as an auditor, a section chief, and an administrative officer, as these positions did not require Plaintiff to perform any work-related activities precluded by his RFC. [DE-13, p.23]. Based on these findings, the ALJ determined that Plaintiff was not under a disability from May 15, 2003, the alleged onset date, through December 31, 2008, the date he was last insured. [DE-13, p.24]. The ALJ's findings were based upon the evidence in the record, summarized in pertinent part as follows.

**Plaintiff's Testimony and Other Evidence of Record**

Plaintiff's date of birth is November 29, 1951, which made him fifty-seven years old at the time of the administrative hearing. [DE-18, p.2]. Plaintiff graduated from high school and obtained an AA degree in agriculture from North Carolina State University with a concentration in field crops and economics. [DE-14, p.11]. He is single, has no children, and rents a home from his brother. [DE-14, p.8]. Plaintiff testified he left his employment as an internal auditor with the state government of North Carolina in May of 2003 because he was "having a lot of problems with [his] back" and knee and suffered "so much pain trying to sit" for extended periods of time at a computer. [DE-14, p.12]. After leaving his auditor position, Plaintiff worked periodically as a barbecue caterer but eventually stopped because of the constant pain in his right knee. [DE-14, pp.9-10].

Plaintiff testified that his thoracic back pain developed subsequent to surgery to repair damage caused by an automobile accident. [DE-14, pp.15-16]. He also suffers from lumbar

degenerative disc disease. [DE-14, p.16]. Plaintiff described the pain in his back as "continuous" and "lingering." [DE-14, p.16]. Plaintiff has also had a total knee replacement. The pain in his right knee is constant and "medium level." [DE-14, p.17]. With regard to his daily functioning, Plaintiff testified he avoids lifting or bending, and can only stand for ten minutes. [DE-14, p.19]. Plaintiff can sit for about fifteen or twenty minutes. [DE-14, pp.19-20]. In addition to his back and knee pain, Plaintiff is diabetic and has heart problems, for which he takes nitroglycerin tablets. [DE-14, p.20]. For his diabetes he takes pills twice daily and eight insulin injections every day. [DE-14, p.21]. The heart problems cause him to experience pain in his left arm and wrist "[a]bout once a week." [DE-14, p.21]. Plaintiff described a typical day as "get up and have coffee and get the paper and let my dogs out and watch CNN, and other than going to the doctor or the drug store or grocery store, that's . . . about the extent of my life." [DE-14, p.23]. Plaintiff prepares his own meals, but stated he requires assistance with other chores, such as mowing the grass or cleaning the house. [DE-14, p.23].

Dr. Andrew V. Beale, an independent vocational expert, testified to Plaintiff's work history. [DE-14, pp.24-26]. Citing the *Dictionary of Occupational Titles* ("DOT"), Dr. Beale noted that as customarily performed, Plaintiff's past relevant occupation of administrative officer or auditor would be skilled and light work. However, based on Plaintiff's report of his actual tasks as an auditor, the position was sedentary. Plaintiff's past work as a section chief was also a skilled and sedentary position. The ALJ then posed the following hypothetical question:

> Assuming an individual age 57 with an AA degree, past relevant work experience as described per the claimant and let's assume the exertional capacity for light work which would involve standing and walking up to six hours, sitting up to six hours in an eight hour day, lifting, carrying, pushing, and pulling 20 pounds occasionally, 10 pounds frequently. The individual would need a sit/stand option allowing him to change from sitting to standing at will. Other nonexertional limitations would include no balancing or climbing ladders, no working at heights

or around dangerous machinery, occasional stooping but no crouching, kneeling, or crawling. With those criteria in mind, first of all, could such an individual do any of the claimant's past relevant work?
[DE-14, p.26].

According to Dr. Beale, an individual with these physical limitations would be capable of working as an auditor or administrative officer, "provided that the need to change positions was reasonable." [DE-14, p.26]. He explained that Plaintiff would "need to be able to essentially stay at the work station" and that changing positions at will "could take it beyond the realm of reasonableness." [DE-14, pp.26-27]. Dr. Beale believed that "chang[ing] positions more than every 30 minutes . . . would not allow for competitive work if this were occurring on an ongoing, daily basis." [DE-14, p.27]. For example, "a requirement to periodically alternate sitting, standing, and walking to relieve discomfort every 10 minutes" would preclude Plaintiff's return to his prior work. [DE-14, p.28].

**Medical Evidence**

The medical evidence is summarized in pertinent part as follows:

**Diabetes Mellitus, Hypertension, Obesity, and Sleep Apnea**

Plaintiff has diabetes mellitus type 2, hypertension, and elevated cholesterol levels, for which he takes prescribed medication on a regular basis. [DE-30, pp.9-11, 27-29; DE-35, pp.2-20; DE-36, pp.2-15]. These conditions are generally stable, although Plaintiff's diabetes can be "difficult to control" at times. [DE-36, pp.4-15; DE-32, p.19]. Most significantly, on June 15, 2006, Plaintiff fainted after becoming hypoglycemic. He was hospitalized overnight and given a neurological evaluation to rule out a transient ischemic attack. [DE-26, pp.3-21]. An MRI showed "no evidence of acute infarction or evidence of metastatic disease." [DE-26, p.4]. Further, a "carotid ultrasound did not reveal any evidence of hemodynamically significant

stenosis." [*Id.*]. His ultimate diagnosis was "[p]ossible transient ischemic attack secondary to occlusion of cerebral vessel." [DE-26, p.3]. While hospitalized, Plaintiff "remained stable without recurrence of any of [his] symptoms and he was discharged home to follow up with his primary care physician." [DE-26, p.4].

The medical evidence also shows that Plaintiff is morbidly obese. On March 23, 2009, his primary care physician, Dr. Patrick O'Connell, noted that Plaintiff's "weight continues to go up at an alarming rate." [DE-36, p.6]. Plaintiff, who is five feet, eleven inches tall, weighed 360 pounds and had gained approximately seventy-five pounds since Dr. O'Connell began treating him eighteen months earlier. Dr. O'Connell believed Plaintiff's weight was "becoming THE central issue for his long term health" because it was compounding his other health conditions. [*Id.*]. Dr. O'Connell "strongly recommended weight loss and explained [the] value of weight and [the] need to lose weight" to Plaintiff. [*Id.*].

In March 2006, Plaintiff underwent polysomnography and was diagnosed with severe obstructive sleep apnea. [DE-21, pp.18-22]. Follow-up polysomnography in April 2006 showed "an excellent response of obstructive sleep apnea to [use of a CPAP machine], but for a very brief time, and not during REM [sleep]." [DE-22, p.31]. Plaintiff sleeps with a CPAP machine. [DE-30, p.45].

**Degenerative Disc Disease**

In May 2006, Plaintiff sought renewed treatment with a neurosurgeon who had previously operated on his back. [DE-22, p.16]. Plaintiff had fallen down in the shower and was experiencing "burning pain on the lateral aspect of his right leg" as well as "pain on the left groin area." [*Id.*]. Upon examination, Plaintiff had "[n]umbness over the lateral aspect of the right leg [and] dysethesias in the left flank." [*Id.*]. X-ray and MRI imaging showed degenerative changes

at multiple levels in the thoracic and lumbar spine.   [DE-22, pp.12-15].

Plaintiff returned to his neurosurgeon in October 2006, reporting that he had significant improvement in his pain with Lyrica medication and that he no longer had radicular pain around the left side.   [DE-25, p.54].   Plaintiff's gait, heel and toe walking, muscle strength, muscle tone, and sensation were all normal, and straight leg raises did not produce pain; however, his deep tendon reflexes were decreased in the upper and lower extremities.   [*Id.*].   MRI imaging of the thoracic spine showed "[m]ultiple thoracic disc bulges . . . without evidence of spinal canal stenosis.   [DE-25, p.52].

In August 2007, Plaintiff returned to the neurosurgery clinic complaining of pain in between his scapula.   [DE-25, p.2].   Plaintiff denied any radicular pain or numbness or weakness in his legs.   Upon examination, Plaintiff's condition was unchanged from October 2006.   After reviewing Plaintiff's MRI scan, his neurosurgeon noted that he did "not see a cause for [Plaintiff's] pain."   [DE-25, p.2].   Plaintiff was treated with stretching exercises.

**Degenerative Joint Disease**

In January 2003, Plaintiff suffered a twisting injury to his right knee.   [DE-24, p.62].   An X-ray examination revealed "collapse of the medial joint line in his right knee" and "some posterior osteophytes."   [DE-24, p.63].   Plaintiff was diagnosed with "medial compartment osteoarthritis of the right knee aggravated by recent twisting injury."   [*Id.*].

On follow-up in March and April 2003, Plaintiff reported continued pain despite conservative treatment.   [DE-24, pp.56-59].   An MRI in May 2003 showed extensive degenerative changes, including a tear of the medial meniscus.   [DE-24, pp.53-54].   In August 2003, Plaintiff underwent right knee arthroscopic surgery.   [DE-24, p.52].   At follow-up six days after the surgery, Plaintiff was bearing his full weight without an assistive device and his right

knee had moderate effusion and a range of motion from 5-90 degrees.   [DE-24, p.51].

Three months following surgery, in November 2003, Plaintiff reported he was "at least 80% improved" and "was quite happy with the outcome."   [DE-24, p.49].   On examination, Plaintiff was walking well without an assistive device.   His right knee had healed with "minimal effusion" and a range of motion of 3-135 degrees, although an x-ray showed continued "advanced tricompartmental osteoarthritis particularly of the medial compartment."   [*Id.*].   Plaintiff's physician encouraged him to lose weight and "continue with conservative care for as long as possible."   [*Id.*].

In September 2004, Plaintiff returned to the orthopedic clinic and reported increasing pain over the previous six months.   [DE-24, p.47].   On examination, Plaintiff had a right antalgic gait and an active range of motion of 5-90 degrees.   [*Id.*].   Updated x-ray imaging again showed advanced tri-compartmental osteoarthritis.   [*Id.*].   Plaintiff elected to proceed with a right total knee replacement, which was performed in December 2004.   [DE-24, pp.38-45].   The procedure went well and his post-operative course was uneventful.   [DE-24, p.38].   After three days of convalescence, Plaintiff was considered stable enough for discharge from the hospital.   [*Id.*].

In January 2005, two and a half weeks after surgery, Plaintiff had completed a stay at a rehabilitation facility and was "ambulating well with a cane."   [DE-24, p.37].   His right knee was healing well, with a range of motion of 5-80 degrees.   [*Id.*].   He was prescribed pain medication and continued therapy.   [*Id.*].   Six weeks after surgery, Plaintiff was walking well without a cane and participating in outpatient therapy.   [DE-24, p.34].   His right knee continued to heal well, with an active range of motion of 5-85 degrees.   [*Id.*].   He was again prescribed pain medication and continued therapy.   Six months following surgery, in June 2005, Plaintiff could walk normally without any assistive device, although he reported some aching in his knee with

prolonged standing and some aggravation of swelling in both legs. [DE-24, p.31]. His active range of motion was 3-105 degrees. [*Id.*]. Plaintiff's physician advised him to "make a serious effort to lose weight." [*Id.*]. One year following surgery, in December 2005, Plaintiff was "markedly improved" compared to his condition before the operation, although he reported some "tightness and stiffness on a day-to-day basis." [DE-24, p.16]. Plaintiff was able to stand and walk normally without any assistive device, his right knee had healed well and showed range of motion from 3-105 degrees with "good tracking and no instability." [*Id.*]. X-ray imaging showed "satisfactory fixation and alignment." [*Id.*]. Two years following surgery, in December 2006, Plaintiff reported "mild aching and stiffness in his knees, but otherwise [felt] he [was] doing reasonably well" with regard to his knees. [DE-25, p.49]. Plaintiff was ambulating without any assistive device, his right knee showed a range of motion from 0-105 degrees, his left knee from 0-120, and a neurovascular exam showed both legs as grossly intact. [*Id.*]. X-ray imaging showed satisfactory fixation and alignment of the right knee and "moderate osteoarthritis primarily of the medial compartment" in the left knee. [*Id.*]. In August 2007, Plaintiff reported to his primary care physician that his right knee bothered him if he was "on it for a long time." [DE-30, p.9].

**Coronary Artery Disease**

On January 18, 2006, Plaintiff sought emergency room treatment for aching in his left arm and shoulder pain radiating to his left jaw. [DE-32, p.19; DE-22, p.18]. Laboratory results indicated that Plaintiff had suffered a heart attack, and he was admitted to the hospital for further cardiac evaluation. [DE-32, p.19.]. During his admission, Plaintiff underwent a "[c]ardiac catheterization which showed an ejection fraction of 45% to 50% with mild inferior hypokinesis, mild anterior hypokinesis but insignificant coronary artery disease." [*Id.*]. His triglycerides

were "markedly elevated." [*Id.*]. Once moved from the cardiac care unit to a general hospital floor, Plaintiff "remained chest pain free" and "was ambulatory without any symptoms." [*Id.*]. Plaintiff was discharged on January 21, 2006, with a recommendation for usual post-heart attack treatment, including Plavix medication for at least nine months. [*Id.*].

After his discharge, Plaintiff began follow-up treatment with a cardiologist. At his initial evaluation in February 2006, Plaintiff was doing "reasonably well without recurrent chest pain or shortness of breath." [DE-22, p.18]. Upon examination, he had normal vital signs, a normal cardiac examination, and "appear[ed] to be reasonably stable on medical therapy following his tiny subendocardial infarction." [*Id.*]. His cardiologist recommended that he continue on "his usual therapy," including Plavix medication, and to "vigorously work on his risk factors." [*Id.*].

Plaintiff returned for follow-up in March 2006, at which time he reported "poor exercise tolerance" and constant fatigue, which "appear[ed] to be related to his increased Lopressor dosages." [DE-22, p.20]. His physician decreased his dosage of Lopressor accordingly. Plaintiff had "no chest pain or symptoms of heart failure." [*Id.*].

On June 15, 2006, Plaintiff had an episode of "transient numbness in his left face, arm, and leg lasting for approximately [ten] minutes during which time he also felt that his left hand was somewhat weak." [DE-26, p.3]. The symptoms resolved on their own. Later the same day, however, Plaintiff became hypoglycemic, felt dizzy and confused with some blurred vision and possible double vision, and had a syncopal episode. [*Id.*]. Plaintiff sought emergency room treatment, where finger stick testing showed low blood sugar. Although he had no neurological symptoms at the emergency room, the hospital admitted Plaintiff based on his reported earlier symptoms for a neurological evaluation to rule out a transitory ischemic attack. [DE-26, p.3]. An MRI showed no evidence of acute infarction or metastatic disease. [DE-26, p.4]. An

echocardiogram "revealed an [ejection fraction] of greater than 55%, [with] no masses . . . seen." [*Id.*]. A "[c]arotid ultrasound did not reveal any evidence of hemodynamically significant stenosis." [DE-26, p.4]. Plaintiff remained stable at the hospital without recurrence of any symptoms. He was discharged on July 16, 2006, with a diagnosis of a possible transient ischemic attack secondary to occlusion of cerebral vessel and a recommendation to follow-up with his primary care physician. [*Id.*].

In August 2006, Plaintiff underwent a Cardiolite study, which showed "a small area of what appeared to be transmural infarction in the posterior wall." [DE-22, p.10]. However, his ejection fraction was preserved and he appeared nonischemic. [*Id.*]. Plaintiff's cardiologist believed he was "getting along reasonably well" and recommended discontinuing his Plavix and increasing his aspirin to two a day. [*Id.*].

On May 15, 2007, Plaintiff was walking outside in the early hours of the morning and woke up several hours later face down in the driveway. [DE-25, p.7]. Plaintiff reported feeling some chest pain just prior to the incident, but no palpitations. [*Id.*]. Plaintiff sought emergency room treatment and underwent a CT of the brain, which showed "no acute intracranial processes." [*Id.*]. His cardiac enzymes were within normal limits. [*Id.*]. A stress test "revealed [a] posterior lateral perfusion defect." [*Id.*]. Plaintiff was admitted to the hospital for further evaluation and underwent an echocardiagram that "revealed a normal [ejection fraction] of greater than 55% and a grade 2 diastolic dysfunction with no evidence of valvular stenosis or regurgitation." [*Id.*]. A cardiac catheterization showed an occlusion in the posterior lateral branch, which "was thought to be a chronic total occlusion not related to the current episode of syncope." [DE-25, p.7]. An MRI of the brain "revealed no evidence of acute intracranial process or intracranial metastases." [*Id.*]. An EEG also revealed no abnormalities. [*Id.*]. The

physicians concluded there were "no clear cardiac or neurologic causes for the syncope" and discharged Plaintiff on May 21, 2007 "with a Loop Monitor to possibly pick up an arrhythmia at home that may have caused syncope." [*Id.*]. Plaintiff's diagnoses at discharge were syncope, coronary artery disease, and diabetes mellitus. [DE-25, p.7].

At his cardiology follow-up in June 2007, Plaintiff reported two brief episodes of fluttering in his chest, but no recurrence of syncope or near syncope since his discharge. [DE-34, p.11]. Plaintiff stated he experienced some leg edema after sitting for a long period of time, with greater swelling in his right leg, and complained of chronic fatigue. [*Id.*]. Plaintiff was continued on medications and referred for cardiac rehabilitation. [*Id.*]. On cardiology follow-up in August 2007, Plaintiff was doing "well from a cardiac standpoint" but "feeling low in energy." [DE-34, p.9]. He was sleeping more and "having a hard time getting going in the morning." [*Id.*]. He reported brief palpitations, but they had improved since his last appointment. [*Id.*]. Plaintiff had no chest pain or pressure and no shortness of breath with his limited activity. [*Id.*]. Plaintiff's cardiologist believed his low energy was "probably related to depression and anxiety." [*Id.*]. Plaintiff was stable, however, "[f]rom a cardiovascular standpoint." [DE-34, p.9].

At routine cardiology follow-up in November 2007, there was no significant change in Plaintiff's condition except weight gain. [DE-34, p.6]. Plaintiff reported "doing no activity" and a poor energy level, although "not as bad as before." [*Id.*]. Plaintiff had no chest pressure, chest pain, or shortness of breath with limited activity. [*Id.*]. His cardiologist discussed with him "the importance for him to maintain weight and to try to lose weight" and "strongly encouraged [Plaintiff] to start increasing his aerobic activity by walking at a slow pace." [*Id.*].

On cardiology follow-up in June 2008, Plaintiff had "gained about 20 pounds and [reported] that his endurance level ha[d] gone down." [DE-34, p.3]. Plaintiff reported having

"some chest pressure with exertion," "no endurance," and becoming out of breath easily. The chest pain or pressure "promptly resolved when he rests and it does not radiate." [DE-34, p.4]. Plaintiff also complained that his severe back and right knee pain limited his activity. [DE-34, p.3]. Three months later, in September 2008, Plaintiff reported improvement in his chest pain with only two episodes of tightness in his left arm since the last appointment. [DE-36, p.31]. Plaintiff reported leading a sedentary lifestyle and denied new onset of shortness of breath or worsened leg edema. [*Id.*]. Plaintiff had continued to gain weight and was not exercising or doing any activity. [*Id.*]. His cardiologist continued Plaintiff on his medical regimen. [*Id.*].

**Consultative Examination and Opinion**

On April 23, 2008, Plaintiff met with Alan Cohen, M.D., for a disability determination evaluation. [DE-30, pp.30-34]. Plaintiff informed Dr. Cohen of his history of back pain following the motor vehicle accident in 1995 and subsequent spinal surgery in 1997. Plaintiff stated "he had 'cracks' again in 2001 and 2003 but can have no more surgery." [*Id.* at p.32]. In addition, Plaintiff reported continued knee pain following his right knee injury in 1995 and total knee replacement in 2004. Because his knee "often gives way on him," Plaintiff told Dr. Cohen he uses a cane or stick when walking outside. [*Id.*]. Dr. Cohen further noted that "[t]wice in 2006 [Plaintiff] had chest pain, but catheterization showed 2 areas of blockage that did not need intervention." [*Id.*]. Plaintiff stated that he "gives out" easily and experienced a "ministroke" in June 2006.

Dr. Cohen listed Plaintiff's past medical history of diabetes, hypertension, mild stroke, heart attack, and arthritis, and noted his use of multiple medications. [*Id.*]. Plaintiff reported symptoms of fatigue, heart pain, and joint pain, with his chief complaint being back pain. [DE-30, pp.32-33]. On examination, Plaintiff was 320 pounds, with "some respiratory distress,"

and "[e]xtreme truncal obesity." [DE-30, p.33]. Cardiac and neurological examinations were normal. Plaintiff could sit, stand, and ambulate with a steady gait but was unable to squat on his right knee, had limited range of motion in his thoracic and lumbar spine, and had difficulty rising from a supine position "as much from his girth and habitus as from his back." [DE-30, p.34].

In Dr. Cohen's opinion, Plaintiff did not need an assistive device for ambulation, and his "ability to sit, stand, handle objects, hear, speak, and travel [wa]s not impaired." [DE-30, p.34]. Further, Dr. Cohen found Plaintiff had moderate impairments in his ability to move about and to carry, and severe impairments in his ability to lift and in his stamina. [*Id.*].

**Medical Opinion Evidence**

On reconsideration, the medical evidence was reviewed on June 18, 2008 by Bertron Haywood, M.D. [DE-34, pp.14-21]. In Dr. Haywood's opinion, Plaintiff remained capable of a light range of exertional activity, could only occasionally climb, balance, and stoop, and would be required to avoid concentrated exposure to hazards such as machinery and heights. [*Id.*]. Dr. Haywood concluded that Plaintiff would be able to do light work. [DE-34, p.21].

Plaintiff's primary care physician, Dr. Patrick O'Connell, completed a medical opinion questionnaire on April 8, 2009. [DE-36, p.19]. In Dr. O'Connell's opinion, Plaintiff could occasionally lift and carry no more than twenty pounds and frequently lift and carry no more than ten pounds. Plaintiff could stand and walk for about three hours during an eight-hour day, with no limitation on his ability to sit. However, Plaintiff needed to periodically alternate sitting, standing, or walking to relieve discomfort. Specifically, Plaintiff could only sit or stand for ten minutes before changing positions. [DE-36, pp.19-20]. Also, Plaintiff's condition required that he alternate between sitting and standing at will. Dr. O'Connell believed that Plaintiff's knee replacement and arthritis, combined with his back surgery, required these accommodations. He

anticipated Plaintiff's medical treatment would require him to be absent from work about twice a month.   [DE-36, p.21].

    With this evidence in mind, the undersigned turns to consideration of Plaintiff's arguments.

## Analysis of Plaintiff's Arguments

    Plaintiff argues the ALJ (1) failed to accord adequate weight to his treating physician's opinion; (2) failed to make specific findings concerning the physical and mental demands of Plaintiff's past relevant work; (3) erred in concluding he was capable of returning to his past relevant work; (4) failed to properly evaluate the severity of his obesity; and (5) erred in assessing his credibility.   These arguments are addressed in turn.

### (1) The ALJ properly considered the treating physician's opinion

    Plaintiff argues the ALJ failed to accord proper weight to the opinion of his primary care physician, Dr. Patrick O'Connell.   When evaluating Plaintiff's RFC, the ALJ noted that he gave "considerable weight to the opinion of Dr. O'Connell except for the conclusion that the claimant needs to change position every 10 minutes."   [DE-13, p.23].   Plaintiff complains that the ALJ failed to state any reason for rejecting Dr. O'Connell's opinion on his need to alternate positions, and further failed to point to any specific contradictory evidence to justify the rejection.

    "[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at 178 (citing 20 C.F.R § 416.927).   "Thus, 'by negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.'"   Id. (quoting Craig, 76

F.3d at 590).   In the face of persuasive contrary evidence, the ALJ has discretion to afford less

weight to the testimony of a treating physician.   *Id.*

 Here, after accepting Dr. O'Connell's assessment with regard to Plaintiff's RFC in all

respects except for his need to alternate positions every ten minutes, the ALJ explained that

Plaintiff

> has rather extensive activities of daily living.   He is able to care for his own
> personal needs.   He was able to attend the hearing and answer questions
> appropriately.   He testified that he goes to the store and cooks meals. . . . [He] does
> light cleaning and some odd jobs.   He washes clothes, cooks food, and gets
> groceries.   He enjoys cooking and surfing on the internet.   He enjoys sports and
> watches television.
> [DE-13, p.23].

These findings are supported by evidence of record.   [*See, e.g.*, DE-30, p.24].   The ALJ

found that, "[i]n view of the evidence . . . the claimant's allegations [regarding his limitations] are

not fully credible."   [DE-13, p.23].   Thus, while not explicitly stated, it is nevertheless clear from

the findings that the ALJ believed Plaintiff's daily activities were inconsistent with the degree of

limitations found by Dr. O'Connell.   It was within the ALJ's discretion to give less weight to Dr.

O'Connell's opinion where it conflicted with other substantial evidence.   Mastro, 270 F.3d at 178.

As the ALJ's reasoning is sufficiently specific and supported by evidence of record, this

assignment of error is overruled.

**(2)  The ALJ properly considered the demands of Plaintiff's past relevant work**

Plaintiff argues the ALJ erred in concluding he could return to his past relevant work

without making specific findings regarding the physical and mental demands of such work.

Upon assessing a claimant's RFC, the ALJ compares the RFC with the physical and mental

demands of the claimant's past relevant work and then determines whether the claimant's

impairments prevent the claimant from performing such work.   20 C.F.R. § 404.1520(e)-(f).   In

determining a claimant's ability to do past relevant work, the ALJ must consider

> (1) the individual's statements as to which past work requirements can no longer be
> met and the reason(s) for his or her inability to meet those requirements; (2)
> medical evidence establishing how the impairment[s] limit[] [his or her] ability to
> meet the physical demands and mental requirements of such work; and (3) in some
> cases, supplementary or corroborative information from other sources such as
> employers, the *Dictionary of Occupational Titles* etc., on the requirements of the
> work as generally performed in the economy.

Newton v. Astrue, 559 F. Supp. 2d 662, 676 (E.D.N.C. 2008) (citing SSR 82-62); *see also* 20
C.F.R. § 1560(b)(2) (noting that, in determining whether a claimant is capable of performing past
relevant work, the Commission may use the services of a vocational expert or other resources, such
as the DOT).    "'[A] claimant will be found "not disabled" if he is capable of performing his past
relevant work either as he performed it in the past or as it is generally required by employers in the
national economy.'"   *Id.* (quoting Pass v. Chater, 65 F.3d 1200, 1207 (1995)).

Here, the ALJ found Plaintiff was capable of performing his past relevant work as an
auditor or section chief and made findings in accordance with the above-listed guidelines.   First,
the ALJ considered Plaintiff's allegations regarding his pain and other symptoms, as well as his
contention that he is no longer able to work.   However, the ALJ concluded such statements were
not entirely credible.   [DE-13, p.23].   Second, the ALJ reviewed the medical evidence regarding
the impact of Plaintiff's impairments on his ability to meet the physical and mental demands of his
past relevant work.   Based on the medical records, the ALJ noted Plaintiff's impairments do not
prevent him from standing, walking or sitting for six hours in an eight-hour day with a sit/stand
option, nor from frequently lifting or carrying ten pounds.   [DE-13, p.22].   Finally, the ALJ
relied on both the DOT and vocational expert testimony as supplementary information.   The VE,
Dr. Beale, reviewed Plaintiff's past work and compared it to occupations as defined in the DOT.

[DE-14, pp.25-26].   Dr. Beale testified that, as customarily performed, Plaintiff's past work as an auditor would normally be categorized as "skilled and light work," but that as described by Plaintiff, the position "would be sedentary with sitting up to six hours and lifting no more than 10 pounds."   [DE-14, p.25].   Plaintiff's past work as a section chief was also "skilled and sedentary work as . . . defined on the DOT."   [*Id.*].   Dr. Beale further testified in response to a hypothetical question about whether a person with the physical and mental limitations imposed by Plaintiff's impairments could meet the demands of his previous work.   [DE-14, p.26].   Dr. Beale affirmed that Plaintiff could perform his past relevant work as an auditor or section chief.   Based on this testimony, the ALJ found that Plaintiff "past relevant work as an administrative officer (light skilled), an internal auditor (light, skilled), and a section chief (sedentary, skilled)" was within his RFC.   *See* Bryant v. Astrue, No. 5:10-CV-281-FL, 2011 U.S. Dist. LEXIS 48926, *33-36 (E.D.N.C. May 6, 2011) (concluding that the ALJ properly adopted the testimony of a VE in determining the claimant's RFC).   Because the ALJ properly evaluated the evidence and made sufficient findings to support his conclusion, Plaintiff's argument on this issue is without merit.

### (3)  **The ALJ made appropriate findings regarding Plaintiff's RFC**

Plaintiff contends the ALJ erred in determining he was capable of performing light work without explicitly finding that Plaintiff could do so on a regular and continuing basis.   Plaintiff further complains that the ALJ failed to state the frequency of Plaintiff's need to alternate sitting and standing in the RFC finding.

RFC is a measurement of the most a claimant can do despite his limitations.   *See* 20 C.F.R. § 404.1545(a).   Under the regulations promulgated by the Social Security, "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.   A 'regular and continuing basis' means 8 hours a day,

for 5 days a week, or an equivalent work schedule." Social Security Regulation (SSR) 96-8p. In light of the explicit language of SSR 96-8p, the ALJ's determination that Plaintiff was capable of performing his past relevant work implicitly contained a finding that he could do so on a regular and continuing basis. *See* Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006) (reasoning that, in view of SSR 96-8p, the ALJ's conclusion that the claimant was capable of a wide range of sedentary work "implicitly contained a finding that [the claimant] physically is able to work an eight hour day"). Plaintiff's objection is therefore without merit.

Plaintiff further contends the RFC is invalid because the ALJ failed to make findings as required by SSR 96-9p regarding how often Plaintiff needs to alternate sitting and standing. However, as pointed out by Defendant, SSR 96-9p only applies where the ALJ finds that the claimant is incapable of a full range of sedentary work. *See* SSR 96-9p (discussing the implications of an RFC for less than a full range of sedentary work). Because the ALJ found Plaintiff capable of a full range of sedentary work, the requirements of SSR 96-9p do not apply to this case. *See* Thompson v. Astrue, No. 8:09-01968-JFA-BHH, 2010 U.S. Dist. LEXIS 102596, *19-20 (D.S.C. June 16, 2010) ("there is no indication that Ruling 96-9p, 1996 SSR LEXIS 6 applies to a step-four analysis"). This assignment of error is therefore overruled.

### (4) The ALJ properly evaluated Plaintiff's obesity

Plaintiff contends the ALJ failed to discuss the impact of Plaintiff's obesity on his RFC. However, a claimant must "allege that an impairment creates a functional limitation or restriction, or for there to be record evidence of an impairment's functional limitations or restrictions, before an ALJ must discuss the impact of the impairment on the claimant's RFC." Kelly v. Astrue, No. 5:08-CV-289-FL, 2009 U.S. Dist. LEXIS 40154, at *9-10 (E.D.N.C. May 12, 2009) (citing 20 C.F.R. § 404.1512(c)). Thus, while the ALJ has a duty to evaluate the intensity and persistence of

a claimant's symptoms, *see* 20 C.F.R. § 404.1529(c), "that duty does not extend to speculating as to the impact of those symptoms." Yurek v. Astrue, No. 5:08-CV-500-FL, 2009 U.S. Dist. LEXIS 78922, *25 (E.D.N.C. July 28, 2009). "Rather, the claimant has the burden of furnishing evidence supporting the existence of a condition and the effect of that condition on [his] ability to work on a sustained basis." *Id.*

Here, although there is evidence of record detailing his obesity, Plaintiff "has failed to do more than suggest that the ALJ should have speculated as to what extent obesity . . . may have impaired [his] ability to work." *Id.*; *see also* Kelly, 2009 U.S. Dist. LEXIS 40154 at *9-10. Plaintiff alleged back pain, knee pain, leg pain, and heart problems resulting in pain, weakness, fatigue, limited range of motion in his knee, and difficulty walking, but made no particular allegations of functional limitations caused by obesity. Similarly, Plaintiff testified at the hearing that he had pain in his back and knee, heart problems, and diabetes, but did not discuss his obesity or allege any specific functional limitations caused by obesity. And while the medical evidence of record clearly shows that Plaintiff's physicians were concerned about his weight, there is no record evidence documenting specific work-related functional limitations or restrictions related to these concerns. There were therefore no specific functional limitations related to obesity for the ALJ to discuss.

Moreover, the record shows the ALJ considered Plaintiff's obesity. The ALJ identified Plaintiff's obesity as a severe impairment. [DE-13, p.18]. The ALJ then reviewed the evidence of record in chronological order, including the medical evidence related to obesity. [DE-13, pp.18-22]. At step three, the ALJ determined that "[t]he medical severity of [Plaintiff's] obesity . . . does not meet or equal the criteria described in section 3.10 or any other section of the Listing." [DE-13, p.22]. To the extent Plaintiff may have limitations due the combined effects of obesity

and his other impairments, the ALJ's discussion of the evidence related to these impairments and his RFC assessment restricting Plaintiff to less than a full range of light work took these into account. Accordingly, Plaintiff's assertion of error with regard to the ALJ's consideration of his obesity is without merit.

**(5)** **The ALJ properly evaluated Plaintiff's credibility**

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." Craig, 76 F.3d at 594. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting 20 C.F.R. §§ 416.929(b) & 404.1529(b))(emphasis omitted). An ALJ must therefore first determine whether a claimant has met the threshold showing with objective evidence demonstrating the existence of a medical impairment "which could reasonably be expected to produce" the actual pain, in the amount and degree, alleged by the claimant. *Id.*

> It is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Id.* at 595. At this second step, the ALJ considers all the available evidence, including the claimant's statements regarding pain, objective medical evidence of pain, medical history, medical signs, laboratory findings, and "any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it." *Id.*

Plaintiff complains the ALJ failed to sufficiently explain his credibility findings. The ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to

cause the alleged symptoms," Plaintiff's statements "concerning the intensity, persistence and

limiting effects of these symptoms are not credible to the extent they are inconsistent with [his]

residual functional capacity assessment." [DE-13, p.23]. The ALJ explained:

> It is noted that when the claimant was seen at the cardiology section in November 2007, since his last appointment, there had been no significant change except that he had gained weight. Physical examination revealed that the claimant was pleasant and appropriate. He was 5'11 tall and weighed 307 pounds. His blood pressure was 135/80. His pain score was 0/10. The lungs were clear to auscultation bilaterally. The heart revealed a regular rate and rhythm. There was no murmur, rub or gallop. He was strongly encouraged to start increasing his aerobic activity by walking at a slow pace (Exhibit 9F). Patrick O'Connell, M.D., reported in April 2009 that the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently. It was felt that he could stand and walk about 3 hours with normal breaks during an 8-hour day. He had no limitation in sitting (Exhibit 16F). The Administrative Law Judge gives considerable weight to the opinion of Dr. O'Connell except for the conclusion that the claimant needs to change position every 10 minutes. It is noted that the claimant has rather extensive activities of daily living. He is able to care for his own personal needs. He was able to attend the hearing and answer questions appropriately. He testified that he goes to the store and cooks meals. Exhibit 4E shows that he does light cleaning and some odd jobs. He washes clothes, cooks food, and gets groceries. He enjoys cooking and surfing on the internet. He enjoys sports and watches television. In view of the evidence, the Administrative Law Judge finds that the claimant's allegations are not fully credible.

[DE-13, p.23]. Thus, according to the ALJ, Plaintiff's assertions of disability were not credible

because the degree of his alleged limitations was inconsistent with both the medical evidence and

the non-medical evidence. Because the ALJ properly followed the two-step process in evaluating

Plaintiff's pain and subjective complaints, this assignment of error lacks merit.

**Conclusion**

For the reasons discussed above, it is RECOMMENDED that Plaintiff's motion for judgment on the pleadings [DE-37] be DENIED, that Defendant's motion for judgment on the pleadings [DE-39] be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Friday, August 12, 2011.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE